IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

                                OPINION AND ORDER

                      Plaintiff,

                                    18-cv-783-bbc

           v.

WAL-MART STORES EAST, LP,

                      Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

       Plaintiff Equal Employment Opportunity Commission has filed this lawsuit under Title VII of the Civil Rights Act of 1964, §§ 42 U.S.C. 2000e(k) and 2000e-2(a)(1), alleging that defendant Wal-Mart Stores East, LP discriminated against Alyssa Gilliam and 10 other pregnant employees by failing to accommodate their pregnancy-related medical restrictions under its temporary alternative duty (TAD) program and forcing them to take unpaid leave if they could not perform their job duties.  Now before the court are the parties' cross motions for summary judgment.  Dkt. ##143 and 146.  Plaintiff contends that it is entitled to summary judgment because the undisputed evidence shows that defendant could have provided light duty assignments to its pregnant workers under its TAD program without any significant burden.  Defendant contends that it did not intentionally discriminate against pregnant workers because until October 16, 2014, the TAD program applied only to associates with occupational (or work-related) injuries and no other employees.  It argues that it chose this specific class of employees for light duty work to increase morale and

loyalty, speed recovery time and decrease costs and legal exposure related to the workers' compensation system.

For the reasons below, I am granting defendant's motion for summary judgment, denying plaintiff's motion for summary judgment and closing this case. Plaintiff's pending motion to compel a 30(b)(6) deposition will be denied as moot.

From the parties' proposed findings of fact and the stipulation entered into by the parties on December 20, 2019, dkt. #48, I find the following facts to be material and undisputed.

UNDISPUTED FACTS

A. Background

On September 20, 2018, plaintiff Equal Employment Opportunity Commission (EEOC) brought this lawsuit on behalf of Alyssa Gilliam and a class of present and former female employees (or associates, as defendant refers to them) of defendant Wal-Mart Stores East, LP. These claimants include Shawna Anderson, Amanda Cigan-Diaz, Kaia Cliff, Monica Horner, Brittney Kitchenmaster, Stephanie Kohls, Stacy Lander, Cassandra Lein, Evelyn Welch and Emily Wiedmaier.

Defendant operates Distribution Center #6025 in Menomonie, Wisconsin, where the claimants all worked for some period of time between October 21, 2014 and October 15, 2017—the relevant period in this case. Associates at the distribution center process and move product through defendant's distribution network to other Wal-Mart stores. They are

required to load, unload, order fill, pack and process freight consisting of Wal-Mart products, ranging from coffee to windshield washer fluid and virtually everything in between.

## B. Defendant's Employment Policies

Between October 21, 2014 and October 15, 2017, distribution center associates enjoyed benefits under a number of defendant's employment policies. During that period, the following performed human resources work for defendant:

Kerry Moore was a divisional human resources manager from about 2006 to 2019. He served as a resource for defendant's human resource departments and distribution centers, including the Menomonie distribution center during the relevant period.

Sedgwick Claims Management Services, Inc. served as the leave administrator for the Menomonie distribution center during the relevant period in this case.

John Murphy was the human resources manager for the distribution center in Menomonie. In that role, he was responsible for insuring that the distribution center's employees' jobs complied with the national temporary alternative duty (TAD) policy.

Kristine Ohman was the human resources office manager and training manager at the Menomonie distribution center.

Daniel Buckley was and continues to be a human resources (or personnel) clerk at the Menomonie distribution center.

1. <u>Temporary alternative duty (TAD) policy</u>

    a. Description of policy

    Before October 16, 2017, defendant offered temporary alternative duty or light duty to associates with occupational injuries. TAD was a national policy. No off-the-job injury or condition, regardless of cause, was eligible for accommodation under TAD. Associates initially placed on TAD were later removed from TAD if their injuries were determined to be non-work-related. No supervisor, manager, coach, or administrative or human resources employee at the distribution center had any discretion to deviate from the terms of the TAD policy or to provide TAD to an associate who did not have an occupational injury.

    The TAD program allows an employee to do only part of their job or finds the employee other work that fits within their restrictions. For example, an occupationally-injured associate with a lifting restriction who was eligible for TAD could be assigned to the tasks of label backing, rack labeling, paperwork, painting and detail cleaning, depending upon the needs of the business and the associate's medical restrictions.

    An employee on TAD receives their normal pay even though they are performing alternate duties. A TAD assignment provides temporary job duties for an initial period of 90 days; it is not a regular duty position. If after 90 days an associate appears to be able to return to work without restrictions within an additional 30 days, the associate may extend his or her TAD assignment for 30 days, upon approval from the divisional human resources manager. If an associate shows no progress or signs of getting better after 90 days, the associate is put on leave.

Between September 1, 2014 and October 15, 2017, defendant provided 100 TAD assignments to 89 different employees injured on the job at the Menomonie distribution center. No employee with a work-related injury was denied TAD during that period, and defendant placed no limit to how many employees could be on TAD at one time.

The medical restrictions of employees who received TAD included lifting restrictions, reduced schedules if needed by an employee, extra breaks for employees who needed them, employees who had limits on standing and employees who had limits on bending, stooping or climbing. For example, if an employee with a work-related injury needed reduced hours, the employee submitted a medical restriction and defendant accommodated it under the TAD program.

Except for those completely unable to work, pregnant employees who were not eligible for TAD had medical restrictions that were the same as or similar to the medical restrictions of the employees with work-related injuries who received TAD. Murphy and Buckley do not recall a pregnant employee with a lifting restriction who received an accommodation other than a leave of absence at the Menomonie distribution center during the relevant period.

b. Stated reasons and purpose for policy

During the period relevant to this lawsuit, defendant's TAD policy stated that

When an associate is injured, the associate may be fearful about the future and the ability to return to work. This fear can be detrimental to recovery. The longer that an injured associate is off work, the more difficult it can become to return to work. It is in the best interest of the associate and Walmart to reassure the injured associate that [Walmart] care[s] and [the associate] is wanted back at work as soon as possible. The TAD program aids in assisting

the injured associate back to work in a temporary position when the associate has medical restrictions that require alternate duty.

\* \* \*

The [] TAD program provides a temporary position or modified job duties to an associate with a work-related injury who was released to modified duty by the treating physician. The temporary position accommodates the associate's restrictions as outlined by the treating physician.

\* \* \*

TAD provides many benefits, including (but not limited to):

- Enhanced associate loyalty as providing TAD demonstrates a caring attitude and allows the associate to continue to be a contributing party of the facility team.
- Increased morale of the injured associate.
- Decreased associate recovery time, which allowed the injured associate to remain productive.
- Lowered accident costs by reducing the payment of lost wages.
- Reduced legal exposure by allowing the associate to earn full wages.

Under Wisconsin's Worker's Compensation Act, Wis. Stat. §§ 102.03, 102.04 and 102.07, an employer is liable when an employee sustains an injury in the course of his or her employment:

- If the employee's injury causes disability, the employer owes an indemnity as wages to the employee. Wis. Stat. § 102.43.

- If the employee's injury causes total disability, the employer owes two-thirds of the average weekly earnings during such disability. Wis. Stat. § 102.43(1).

- If the employee's injury causes partial disability, during the partial disability, the employer owes such proportion of the weekly indemnity rate for total disability as the actual wage loss of the injured employee bears to the injured employee's average weekly wage at the time of the injury. Wis. Stat. § 102.43(2).

- An employer is generally liable for compensation payable as loss of earnings for periods of temporary disability.  Wis. Stat. § 102.43(9).

- Compensation is payable during periods of temporary disability when the employee could return to a restricted type of work during the healing period, unless suitable employment that is within the physical and mental limitations of the employee is furnished to the employee by the employer or some other employer.  Wis. Stat. § 102.43(9)(a).

Under Wisconsin law, defendant may reduce the indemnity it pays as wages by offering an occupationally-injured associate work within his or her restrictions.  By allowing an associate injured on the job to continue working under TAD, defendant reduces its legal exposure because the associate earns full wages, instead of the reduced wages under the worker's compensation system.   TAD also reduces defendant's costs overall because defendant receives work from the associate with the occupational injury and does not have to hire a different associate to do that work while the occupationally-injured associate performs no work.

According to the Wisconsin Department of Workforce Development:

- It is to everyone's advantage to return to work as soon as possible after injury – within medical restrictions – because returning to work helps employees more readily recover from injuries.

- There are other good reasons for an early return to work including:  if employers have some type of return to work program, the majority of workers will return to their jobs earlier in their recovery period.

- Studies have shown that employers who have proactive return-to-work program had:  (1) a lower rate of lost workday cases; (2) a reduction in worker's compensation claims incidence; and (3) fewer lost workdays per 100 employees.

- Return to work programs reduce claims, lower premium and litigation expenses and improve the employer's public image.

Wisconsin Worker's Compensation Guide, p. 13.

c.  TAD made available to pregnant workers

Effective October 16, 2017, defendant made pregnant associates eligible for TAD through its "Accommodation in Employment" (or ADA) policies, stating that it is continuously looking for ways to improve its practices and policies to support the needs of its workforce and that it wanted to create a positive working environment for pregnant associates and management.  (Without explanation, plaintiff says that defendant's proposed findings of fact regarding defendant's alleged intentions lack foundation.   However, defendant appropriately relies on the declaration of Murphy, who avers that during the regular course of business, he and other human resources and operations managers received an October 19, 2017 email from defendant's "Field Logistics HR Communications group" entitled "Field Logistics HR Communications – Week 38 – Oct. 14-20," in which the above intentions were communicated.  See dkt. #150 at ¶¶ 2, 4, 31, 32 and exh. A.  The email is admissible as a record of a regularly conducted business activity under Fed. R. Evid. 803(6).)

Defendant's national accommodation policy now provides that "[i]f, due to pregnancy, childbirth, breastfeeding, or related conditions, you are unable to perform the essential functions of your job with another reasonable accommodation, you may be eligible for Temporary Alternative Duty (TAD)."

Defendant does not have any document that analyzes the cost of providing TAD or other light duty to employees with pregnancy-related medical restrictions, before or after it

began accommodating pregnancy-related medical restrictions at the distribution center. However, accommodating women with pregnancy-related medical restrictions has not impeded or interfered with defendant's ability to accommodate employees with work-related injuries at the distribution center.

2. ADA policy

Before October 16, 2017, a pregnant associate who had medical restrictions could seek an accommodation under defendant's Accommodation in Employment or ADA policy, which is applicable nationwide. The policy provides reasonable accommodations to pregnant employees and employees with disabilities. At that time, defendant accommodated medical restrictions relating to pregnancy like any other medical restriction arising from another, non-work-related cause.

The accommodation policy states that reasonable accommodations do not include eliminating essential functions of a job or transferring an essential function to another associate. Under the policy, an associate with a medical restriction that required eliminating essential functions—such as lifting requirements—could seek an accommodation in the form of a job transfer to a position within the distribution center or a Walmart store that could accommodate the restriction without eliminating essential functions. If an associate elected not to pursue a transfer or a transfer was not available, the associate could take leave. If an associate exhausted her leave but was not yet medically ready to return to work, defendant would look for alternative accommodations to allow the associate to return to work. In

9

addition, defendant would consider whether the associate should be offered job reassignment. If defendant offered a job reassignment, the associate's leave would be extended as "reassignment leave" while defendant conducted a job search for a suitable position.

Generally, associates seeking an accommodation were referred to the Accommodation Service Center, which reported to defendant's human resources department whether there was an accommodation available for the associate. If an associate with a medical restriction stated that he or she wanted to take a leave of absence, the human resources manager referred the associate to Sedgwick, which administered defendant's leave programs. If an associate pursuing a leave of absence requested an accommodation, Sedgwick worked as a team with the Accommodation Service Center. Sedgwick made the decision regarding whether an associate was eligible for a leave of absence, and Sedgwick or the Accommodation Service Center made the decision regarding whether an associate was eligible for an accommodation.

3. FMLA and personal leave of absence policies

Depending on her medical restrictions, a pregnant associate and any other employee working in the distribution center could take an unpaid leave of absence under the Family Medical Leave Act (FMLA), Wisconsin's version of the FMLA or defendant's personal leave of absence policy. Although the leave was often unpaid, employees continued to receive their health insurance benefits during the leave period. Depending on the reason for the

leave, the employee also may qualify for unemployment benefits or benefits under a short-term disability policy while on leave.

4.  Schedule changes for students

Moore, defendant's former divisional human resources manager, does not know of any official policy that defendant had with respect to employee requests to change their work schedule because it conflicted with a school schedule, but defendant encouraged employees to advance their education and told employees to let human resources personnel know if their school schedule conflicted with their work schedules so that defendant could try to help them in some way.  According to Buckley, a personnel clerk at the Menomonie distribution center, there were no rules regarding whether a school schedule change request would be allowed.  Decisions regarding schedule changes were made at the distribution center level.

Murphy remembers that during the relevant period, eight or nine employees at the Menomonie distribution center asked to reduce or change their work hours because of a school schedule.  According to Murphy, these requests were "probably" granted if there were no staffing issues.

For example, claimant Kohls, who worked 12 hours a day on Saturdays, Sundays and Mondays, requested Mondays off between October and December 2016 because she had a class.  Although Murphy does not remember the situation specifically, Kohls's request apparently was approved because Monday is a light (not busy) day.  Around 2005, Samantha Bergevin, an order filler at the Menomonie distribution center, asked her

supervisor for reduced hours to accommodate her school schedule. Her supervisor asked for a copy of her class schedule and eventually granted her request for reduced hours. (There is no information on how the request was considered or why it was granted.) Otherwise, students who wanted to change their schedule for the semester had to go through the job transfer process and sign up for a different schedule, and if there was another job available, the student might receive that new position.

## C.  Claimants' Experiences

Regardless of their positions, the relevant physical activities necessary to perform one or more of the essential functions of the claimants' positions included the ability to move, lift, carry, and place merchandise weighing up to 40 pounds – and in some cases, 60 pounds – without assistance. All of the claimants except Horner were medically restricted from lifting less than 40 or 60 pounds and took a leave of absence under either the FMLA or defendant's personal leave policy, often without pay. The claimants remained eligible for health care benefits while on leave, under the same conditions as if they were working. In addition, defendant offered claimants the opportunity to transfer to a position at a store that could accommodate their restrictions. Some specific examples include the following:

- Gilliam received a five-pound lifting restriction and was excused from all work as of November 10, 2015. When she gave the restriction to Murphy, he directed her to fill out an FMLA leave request, and she went on leave until she gave birth on January 22, 2016. Previously, Moore had told Gilliam that any pregnancy-related lifting restrictions would not qualify her for TAD, but she could apply for an accommodation, although he could not say what the outcome would be.

12

- Horner did not have a lifting restriction during her 2014 pregnancy, but she had trouble standing for 12 hours a day when she was about six or seven months pregnant. When Horner asked for a job that would get her off her feet, defendant permitted her to do a seated job scanning freight. (The parties dispute whether Horner declined this accommodation, but the dispute is not material.)

- When Cigan-Diaz and Cliff went on leave for their pregnancy-related medical restrictions, they requested and received unemployment benefits.

- Anderson was placed on reassignment leave, but there were no positions available that met her restrictions. Also, during her leave, Anderson injured her foot, but the TAD program was not available to her because the injury occurred off-the-job.

- In addition to a 25-pound lifting restriction, Kohls was limited to working no more than eight hours during a shift. Defendant granted Kohls an accommodation of reassignment but was unable to find a suitable open position, so Kohls remained on leave until she gave birth.

- After Lander's doctor prescribed a reduced schedule, Lander did not request an accommodation but requested intermittent FMLA leave through Sedgwick.

- Lien received a 20-pound pregnancy-related lifting restriction on December 10, 2014 and went on leave until she gave birth on December 28. On December 24, defendant's Accommodation Service Center told Lien that there were no reasonable accommodation options for her but it offered Lein the ability to extend her leave or apply for transfer opportunities both within and outside the distribution center.

- After Welch learned that she was pregnant, she hoped to transfer to another department, but she had not been working with defendant long enough to qualify for a transfer at that point. After discussing the matter with Ohman, Welch decided to resign and reapply for a less physically demanding job. She applied for and was hired for the position of forklift driver. When she became completely unable to work because of pregnancy-related back pain, she went on a continuous leave of absence.

- In 2015, Wiedmaier went on leave under defendant's personal leave policy after she was assessed with pregnancy-related lifting restrictions because she did not qualify for TAD or FMLA leave. Although she requested an

accommodation, there were no available positions at the distribution center for someone with her lifting restrictions.  Defendant treated her similarly when she injured her hand outside of work, placing her on a leave of absence.  During her second pregnancy in 2017, defendant offered her TAD for her lifting restrictions because the policy had changed.

OPINION

A. <u>Legal Standard</u>

Title VII of the Civil Rights Act of 1964 forbids an employer from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of . . . sex." 42 U.S.C. § 2000e-2(a)(1).  In 1978, Congress enacted the Pregnancy Discrimination Act, 92 Stat. 2076, which amended Title VII to clarify that the terms "because of sex" and "on the basis of sex" include "pregnancy, childbirth, or related medical conditions," and that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k).  Like other Title VII discrimination claims, pregnancy discrimination may be proven under either a disparate treatment or disparate impact theory of liability.  <u>Young v. United Parcel Service, Inc.</u>, 575 U.S. 206, 135 S. Ct. 1338, 1345 (2015).

In this case, plaintiff is alleging a disparate-treatment claim based on defendant's failure to accommodate the claimants' pregnancy-related lifting restrictions under its TAD program.  Although defendant suggests that plaintiff has attempted to broaden its claim to include accommodations related to breastfeeding or schedule changes, plaintiff makes clear that it is not adding any such claims.  Dkt. #173 at 4.  (Plaintiff does argue that defendant's

failure to provide breaks for employees who are breastfeeding and schedule adjustments for pregnant women are evidence of defendant's animus toward pregnant women, but that issue will be discussed below.)

To establish disparate treatment, a plaintiff must show that defendant's actions were motivated by a discriminatory intent, either through direct evidence of intent or by utilizing the three-part burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Young, 135 S. Ct. at 1345, 1353 (applying modified McDonnell Douglas framework to pregnancy discrimination claim). The parties agree that there is no direct evidence of discrimination and that plaintiff's claim should be analyzed using the burden-shifting framework outlined in Young for pregnancy discrimination claims alleging disparate treatment.

A plaintiff alleging that the denial of an accommodation constituted disparate treatment under the Pregnancy Discrimination Act first must establish a prima facie case by showing that: (1) she belongs to the protected class; (2) she sought accommodation; (3) the employer did not accommodate her; and (4) the employer accommodated others "similar in their ability or inability to work." Id. at 1354. If plaintiff satisfies her initial burden, a presumption of discriminatory intent arises and the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its policy or action. Id. "[C]onsistent with the Act's basic objective, that reason normally cannot consist simply of a claim that it is more expensive or less convenient to add pregnant women to the category of those ('similar in their ability or inability to work') whom the employer accommodates." Id. If

the employer offers an apparently "legitimate, non-discriminatory" reason for its actions, the burden shifts back to plaintiff to show by a preponderance of the evidence that the employer's proffered reason(s) are pretextual.  Id.

Defendant contends that plaintiff cannot satisfy its burden of making a prima facie case or showing that defendant's reliance on a facially-neutral TAD policy is a pretext for pregnancy discrimination.   In addition, defendant argues that Kaia Cliff's claim is time-barred, Monica Horner's claim should be dismissed because she rejected defendant's proposed accommodation, and plaintiff is not entitled to punitive damages or injunctive relief.  I will address separately the parties' arguments with respect to the prima facie case and pretext under Young's burden-shifting paradigm.  However, because I conclude that plaintiff has failed to meet its burden with respect to pretext, it is unnecessary to address defendant's other arguments.

### B.  Plaintiff's Prima Facie Case

Defendant does not dispute that the claimants are members of the protected class who sought accommodations for pregnancy-related lifting restrictions that defendant did not accommodate with light duty (with the exception of Horner).  Rather, defendant argues that plaintiff fails to identify any similarly-situated, non-pregnant employee who was provided with a lifting restriction accommodation.   It argues that because its TAD policy was pregnancy-neutral, plaintiff cannot use employees who received TAD as comparators to its claimants.  Dkt. #151 at 23-27.

In support of its argument, defendant relies in large part on a Seventh Circuit case that predates Young, in which the court of appeals found that an employer's modified-work policy—which provided accommodations to employees who sustained work-related injuries and qualified individuals with a disability under the ADA—did not directly discriminate on the basis of pregnancy.  Serednyj v. Beverly Healthcare, LLC, 656 F.3d 540 (7th Cir. 2011), abrogated by Young, 135 S. Ct. 1338.  Defendant argues that because the court of appeals did not discuss employees with occupational injuries as possible comparators in its analysis of the similarly-situated prong of plaintiff's prima facie case, see id. at 551, occupationally-injured employees are not similarly situated to pregnant workers as a matter of law.  However, Serednyj does not support defendant's broad interpretation.  The court of appeals analyzed the specific circumstances surrounding five individuals whom plaintiff had identified as possible comparators and found that plaintiff either did not provide enough information about those individuals or could not show that they were subject to defendant's work modification policy.  Id. at 551-52.  The court of appeals did not state expressly or otherwise hold that occupationally-injured employees are not similarly situated to pregnant workers as a matter of law.

In any event, contrary to defendant's contention, Young abrogated the decision in Serednyj.  Young, 135 S. Ct. at 1348 (noting lower courts' uncertainty about interpretation of Pregnancy Discrimination Act and that Serednyj was on one side of split).  The Court in Young made clear that a plaintiff's burden in establishing a prima facie case is "not onerous" and that the fourth prong requires only that plaintiff show that her employer accommodated

17

others "similar in their ability or inability to work."  135 S. Ct. at 1354.  In finding that "there was a genuine dispute as to whether UPS provided more favorable treatment to at least some employees whose situation cannot reasonably be distinguished from Young's," the Court agreed that employees who receive light duty for occupational injuries are appropriate comparators to pregnant employees who are not eligible for light duty.  Id. at 1355.

Significantly, the only two federal appellate courts considering Young in detail have found the same.  Durham v. Rural/Metro Corporation, 955 F.3d 1279, 1285-86 (11th Cir. 2020) (per curiam) (quoting Lewis v. City of Union City, Ga., 918 F.3d 1213, 1228 n.14 (11th Cir. 2019), and finding that plaintiff, who was pregnant, and her colleagues, who were injured on the job, were "similar in their ability or inability" to perform the lifting duties of an EMT); Legg v. Ulster, 820 F.3d 67, 74 (2d Cir. 2016) (plaintiff established prima facie case of discrimination under Young because county's policy provided light duty to other employees who were similar in their ability or inability to work, namely, those who were unable to perform non-light-duty tasks as result of injuries incurred on-duty).  As the court of appeals in Durham observed, "in contrast to Title VII's more general comparator analysis, 'the comparator analysis under the [Pregnancy Discrimination Act] focuses on a single criterion—one's ability to do the job.'"

In this case it is undisputed that pregnant employees who were not completely unable to work had the same or similar medical restrictions as employees with work-related injuries who received TAD.  Therefore, I am persuaded that plaintiff has satisfied the fourth prong of its prima facie case of discrimination under Young.

C. <u>Defendant's TAD Policy and Plaintiff's Allegations of Pretext</u>

Defendant contends that it had several legitimate, non-discriminatory reasons for providing TAD only to employees who had been injured on the job, including increasing morale and loyalty, speeding up an employee's recovery time and decreasing costs and legal exposure.  It is undisputed that defendant's written TAD policy explains that these are the benefits of the program and that the Wisconsin Department of Workforce Development holds similar beliefs with respect to the worker's compensation system.   Defendant emphasizes that the policy is "pregnancy blind" and has not been applied to any employees who were not injured on the job.  On the other hand, plaintiff criticizes defendant for relying on its facially neutral TAD policy and "trotting out the generic reasons why companies have workers' compensation programs," arguing that nothing in the TAD policy would have prevented defendant from offering the same accommodations to pregnant employees.  Dkt. #173 at 9.  Plaintiff points out that providing TAD to employees with pregnancy-related medical restrictions was feasible because defendant eventually instituted such a policy with no negative impact on defendant's ability to accommodate employees with work-related injuries.

In <u>Young</u>, which involved facts similar to those in this case, the Supreme Court addressed how the Pregnancy Discrimination Act "applies in the context of an employer's policy that accommodates many, but not all, workers with nonpregnancy-related disabilities." <u>Young</u>, 135 S. Ct. at 1343-44.  Young was a part-time UPS driver who was required to lift parcels weighing up to 70 pounds without assistance but had a pregnancy-

19

related lifting restriction of 20 pounds.  Id.  UPS told Young that she could not work while under the lifting restriction.  Id.  Although UPS had accommodated other drivers with lifting restrictions, those drivers fell into three different categories that were not applicable to plaintiff:  (1) drivers injured on the job, who were subject to a temporary duty policy (although there also was some evidence that some drivers injured off the job had received accommodations as well); (2) drivers who lost their driver certification for failing a medical exam, losing a driver's license, or being involved in a motor vehicle accident; and (3) drivers who suffered from a permanent disability covered by the Americans With Disabilities Act (ADA).  Id. at 1344, 1346-48.

In Young, the Supreme Court held that the Pregnancy Discrimination Act requires courts to consider the *extent* to which an employer's policy treats pregnant workers less favorably than it treats non-pregnant workers who are similar in their ability or inability to work.  Id. at 1344.  Specifically, it explained that:

> [A]s in all cases in which an individual plaintiff seeks to show disparate treatment through indirect evidence—it requires courts to consider any legitimate, nondiscriminatory, nonpretextual justification for these differences in treatment.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).  Ultimately the court must determine whether the nature of the employer's policy and the way in which it burdens pregnant women shows that the employer has engaged in intentional discrimination.

Id.  However, the Court emphasized that Congress did not intend to grant pregnant workers "an unconditional most-favored-nation status," noting that "disparate-treatment law normally permits an employer to implement policies that are not intended to harm members of a protected class, even if their implementation sometimes harms those members, as long

as the employer has a legitimate, nondiscriminatory, nonpretextual reason for doing so." Id. at 1350.

The Supreme Court specifically declined to endorse an EEOC guideline that construed the Pregnancy Discrimination Act to entirely prohibit policies that "provid[e] light duty only to workers injured on the job," implying that such an interpretation would grant pregnant workers a "most-favored-nation status." Young, 135 S. Ct. at 1351-52. See also Legg, 820 F.3d at 77 (noting same). Rather, "[w]hether it is appropriate to infer a discriminatory intent from the pattern of exceptions in a particular workplace will depend on the inferences that can be drawn from that pattern and the credibility of the employer's purported reasons for adopting them." Legg, 820 F.3d at 78. For example, in Young, the Court found that

> [I]f the facts are as Young says they are, she can show that UPS accommodates *most* non-pregnant employees with lifting limitations [through three separate accommodation policies] while categorically failing to accommodate pregnant employees with lifting limitations. Young might also add that the fact that UPS has multiple policies that accommodate non-pregnant employees with lifting restrictions suggests that its reasons for failing to accommodate pregnant employees with lifting restrictions are not sufficiently strong—to the point that a jury could find that its reasons for failing to accommodate pregnant employees give rise to an inference of intentional discrimination.

Id. at 1354-55 (emphasis added).

Young recognized that a plaintiff "may reach a jury on [the issue of pretext] by providing sufficient evidence that the employer's policies impose a significant burden on pregnant workers, and that the employer's 'legitimate, nondiscriminatory' reasons are not sufficiently strong to justify the burden, but rather—when considered along with the burden

imposed—give rise to an inference of intentional discrimination." <u>Young</u>, 135 S. Ct. at 1354.  The Court held that a plaintiff can create a genuine issue of material fact as to whether a significant burden exists by providing evidence that the employer accommodates a large percentage of non-pregnant workers while failing to accommodate a large percentage of pregnant workers.  <u>Id.</u>

Initially, plaintiff argues that defendant has not alleged any burden on its side of the scale and has not attempted to compare its actual burden to the burden placed on pregnant women, or to compare the percentages of employees burdened by the discriminatory policy, as <u>Young</u> instructs.  However, plaintiff's arguments shift the burden back to defendant at the pretext stage, which is not appropriate.  <u>Durham v. Rural/Metro Corp.</u>, 2020 WL 7024892, at *4 (N.D. Ala. Nov. 30, 2020) (finding same in case in which plaintiff made similar arguments).  <u>Young</u> requires *plaintiff* to establish that her employer's policies impose a significant burden on pregnant workers as compared to non-pregnant workers and to present evidence related to percentages.  <u>Young</u>, 135 S. Ct. at 1354.

In an attempt to show that defendant placed a significant burden on pregnant workers, plaintiff argues that during the relevant time period, 100 percent of employees injured on-the-job who were able to work at all were accommodated under TAD, while no pregnant employees with medical restrictions were even eligible for TAD.  Although this particular disparity is relevant and shows that pregnant employees suffered a burden, it says little about non-pregnant employees in general.  It is undisputed that during the relevant period, defendant provided TAD assignments to 89 employees injured on the job, but

22

plaintiff has presented scant evidence or discussion about how defendant treated non-pregnant employees with medical restrictions who were not injured on the job.  For example, plaintiff has not presented any evidence about what percentage of non-pregnant workers not injured on the job were provided accommodations or forced to take leave.  (In its response to plaintiff's proposed findings of fact regarding percentages, defendant presents some evidence showing that pregnant employees comprised only a small percentage of the 345 associates who were placed on leave during the relevant period because they did not qualify for TAD and defendant could not accommodate their lifting restrictions.  Plaintiff challenges this evidence on the general ground that the witness presenting the evidence (one of defendant's attorneys) does not have personal knowledge of the matter.  Because the parties did not fully develop their arguments regarding this issue, I have not considered defendant's evidence.)

In a one-sentence argument in its brief in support of summary judgment, plaintiff also contends that because defendant's ADA policy states that employees with disabilities—who presumably were not injured on the job—were considered for accommodations at work, employees with disabilities represent "another group of employees who were eligible to receive accommodations for lifting restrictions even though they had not been injured on the job." Dkt. #144 at 11.  However, plaintiff fails to develop this argument or cite specific evidence to support it.  Id.  Further, it is undisputed that defendant accommodated medical restrictions relating to pregnancy like any other medical restriction arising from another, non-work-related cause.  It is undisputed that under defendant's ADA policy, an associate

with a medical restriction that left her unable to perform essential functions could seek a job transfer, and if a transfer was not available, the associate could take leave.  In addition, defendant would consider whether the associate should be offered job reassignment.  If so, defendant placed the associate on "reassignment leave" while it searched for a suitable position.

Although plaintiff does not discuss the issue in detail in its briefs, there is evidence in the record that some of the claimants sought and were considered for an accommodation under defendant's ADA policy but had to remain on leave because a suitable open position was not available.  However, it is undisputed that *all* workers not injured on the job were subject to the same rules regarding job transfers, reassignment and leave.  Moreover, as discussed above, plaintiff fails to point to evidence about how employees not injured on the job or employees with permanent disabilities fared under the ADA policy.  As a result,  there is insufficient evidence from which a reasonable jury could determine that defendant's ADA policy treated pregnant employees less favorably than non-pregnant employees with disabilities or non-pregnant employees who had temporary medical restrictions from injuries sustained off the job.  "A policy that requires nearly all workers to use sick leave when injured or ill rather than be accommodated on the job with light duty is not an unreasonable one." Legg, 820 F.3d at 78.  See also Durham, 2020 WL 7024892, at *4 ("Certainly, a loss of income is a significant burden on any worker," but "Durham has presented no evidence that the burden of losing income is particular to pregnant workers, nor that the burden outweighs Rural/Metro's reasons for offering light duty only to workers injured on the job.").

24

Plaintiff contends that in addition to light duty jobs not requiring heavy lifting, defendant could have accommodated pregnant employees with a reduced schedule, as it did for some occupationally-injured employees under the TAD program.  It argues that defendant's willingness to make simple schedule adjustments for students is evidence of its intent to discriminate against pregnant employees whom it forced to take FMLA leave. However, there is insufficient evidence from which a reasonable jury could conclude that defendant accommodates *most* non-pregnant employees with schedule changes while categorically failing to accommodate pregnant employees with schedule changes.

Unlike pregnancy-related accommodation requests, defendant did not have a corporate policy or any set rules regarding the accommodation of school schedules.  Those decisions seemed to have been made on an ad hoc basis and depended on staffing at the store.  For example, the undisputed facts show that eight or nine employees at the Menomonie distribution center, including Kohls and Bergevin, asked for and may have been granted modifications to their schedule so that they could attend a class.  Otherwise, students who wanted to change their schedule for the semester had to go through the job transfer process and sign up for a different schedule, a process similar to the one specified for pregnant and non-occupationally-injured employees requesting an accommodation. Although there is evidence that defendant denied claimant Kohls's request for reduced hours to accommodate her pregnancy-related medical restriction for eight-hour shifts because there was no position available for her, it is unclear from the record how defendant treated similar requests from other employees with pregnancy-related medical restrictions or employees who

were injured off the job.  However, it is undisputed that all employees needing accommodations for medical reasons—whether lifting restrictions, schedule changes or other modifications—were treated the same.

Plaintiff also has failed to offer a sufficient explanation as to why a distribution center manager's decision to change a schedule for a student is comparable or relevant to defendant's corporate decision to deny light duty to employees with pregnancy-related medical restrictions.  Unlike the pregnant employees, the students were not seeking accommodations for medical conditions and were not necessarily seeking shorter shifts as a modification to their job.  They simply wanted to attend classes during certain time periods.  Moreover, the individuals making decisions with respect to student schedules were completely different from those making decisions involving the claimants.  Without more, a reasonable jury could not infer discriminatory intent from the occasional and ad hoc practice of allowing students to change their schedules.

Apart from the TAD policy's exclusion of pregnant workers, plaintiff has not presented sufficient evidence to call into question defendant's motives for not offering pregnant employees light-duty work.  For example, in Legg, the court of appeals found that a jury could find the county's proffered reason for offering light duty only to workers injured on the job—namely, compliance with a state workers' compensation scheme—was a pretext for discrimination because there was evidence of inconsistencies in the employer's justification for declining to extend light duty accommodations to pregnant employees and for denying Legg's request for an accommodation; evidence that cost was a factor in not

offering an accommodation; and the policy categorically denied accommodation with light duty (as in <u>Young</u>).  <u>Legg</u>, 820 F.3d at 77.  Plaintiff has not cited examples of defendant failing to follow its own TAD and ADA policies, offering inconsistent explanations for its TAD policy, or offering inconsistent explanations for denying job transfers or assignments to pregnant workers with medical restrictions.

Although plaintiff states in its supplemental proposed findings of fact and its responses to defendant's proposed findings of fact that defendant's human resources managers and other local administrative personnel discouraged pregnant employees from seeking accommodations, <u>e.g.</u>, dkt. #191 at ¶¶ 110-20 and dkt. #192 at ¶ 25, it fails to develop this argument in its briefs in any meaningful way.  Moreover, the evidence that plaintiff cites in support of its factual assertions is inadmissible hearsay and cannot be offered as evidence of defendant's state of mind.

Claimants Gilliam, Kitchenmaster, Anderson, Horner, Welch, Lander, Cigan-Diaz and Wiedmaier testified that Buckley, Murphy or their supervisors told them that if they had lifting restrictions, they had to take a leave of absence because defendant does not offer light duty to pregnant women and in some cases told them they could not be in the building if they had lifting restrictions.  <u>See</u> dkt. #185 at ¶¶ 111-20.  As defendant points out, many of these statements merely describe the limited scope of defendant's TAD policy and its inapplicability to pregnant workers with medical restrictions.  For example, when Lander became pregnant and asked Ohman about what information she may need from her doctor about any medical restrictions, Ohman told Lander that if her doctor placed her on bed rest

or on a lifting restriction, she would not be able to come back to work until she was 100 percent and defendant would treat her the same as an associate who had been injured outside of work.  Dkt. #156 at 105-06.  (Lander did not have any restrictions at that time.) Notably, Ohman told Lander that defendant *could* accommodate a reduced hours restriction and gave her the telephone number for Sedgwick so Lander could get more information about what to do if she was assessed with medical restrictions.  Id.

In any event, as defendant argues, statements by employees regarding matters outside the scope of their employment are inadmissible hearsay.  Fed. R. Evid. 801(d)(2)(D) (opposing party's statement is not hearsay if made by party's agent or employee on matter within scope of employment relationship while it existed); Stephens v. Erickson, 569 F.3d 779, 793 (7th Cir. 2009) ("For an agent's statement regarding an employment action to constitute an admission . . . her duties must encompass some responsibility related to the 'decisionmaking process affecting the employment action.'").  It is undisputed in this case that defendant's TAD and ADA policies were national policies.  No supervisor, manager, coach, or administrative or human resources employee at the distribution center, had any discretion to deviate from the terms of the TAD policy or to provide TAD to an associate who did not have an occupational injury.  Similarly, Sedgwick made the decision regarding whether an associate was eligible for a leave of absence, and either Sedgwick or the Accommodation Service Center decided whether an associate was eligible for an accommodation.

In addition to the statements about having to take a leave of absence, some of the claimants testified that they were harassed by their managers and coworkers for expressing breast milk at work and were not provided a clean, private space to pump breast milk.  See dkt #191 at ¶¶ 39-44 (Welch testified that her managers harassed her for taking time to express breast milk at work and forced her and other women to pump in a dirty bathroom or their cars); id. at ¶¶ 50-52 (Wiedmaier testified that she was not provided adequate time or space to express breast milk); id. at ¶¶ 53-55 (Cigan-Diaz testified that Buckley would not provide her a place to pump or excuse her from her productivity quota if she took extra breaks to pump); id. at ¶¶ 56-59 (Bergevin testified that she was forced to pump in a bathroom or the first aid station if it was not in use and that her co-workers got mad at her and made negative comments when she took breaks to express breast milk).  As plaintiff itself admits, it has not brought a hostile work environment claim or any claim related to the accommodation of breastfeeding.  Rather, it argues that the statements made by the claimants' supervisors, coworkers and human resources personnel are evidence of *defendant's* general animus toward pregnant women.

The Seventh Circuit has recognized that "[o]ther-acts evidence may be relevant and admissible in a discrimination case to prove, for example, intent or pretext."  Manuel v. City of Chicago, 335 F.3d 592, 596 (7th Cir. 2003) (citing Fed. R. Evid. 404(b) and Vance v. S. Bell Telephone & Telegraph Co., 863 F.2d 1503, 1511 n.5 (11th Cir. 1989)).  However, Rule 403 of the Federal Rules of Evidence still authorizes exclusion "if [the evidence's] probative value is substantially outweighed by the danger of unfair prejudice, confusion of

the issues, or misleading the jury, or by considerations of undue delay." Id. (quoting Fed.

R. Evid. 403).  In particular,

> [I]t's not enough for the proponent of the other-act evidence simply to point to a purpose in the "permitted" list and assert that the other-act evidence is relevant to it.  Rule 404(b) is not just concerned with the ultimate conclusion, but also with the chain of reasoning that supports the non-propensity purpose for admitting the evidence.  In other words, the rule allows the use of other-act evidence only when its admission is supported by some propensity-free chain of reasoning. . . .  Rule 404(b) excludes the evidence if its relevance to "another purpose" is established only through the forbidden propensity interference.

 United States v. Gomez, 763 F.3d 845, 856 (7th Cir. 2014) (internal citations omitted).

Waite v. Wood County Wisconsin, No. 16-cv-643-wmc, 2017 WL 11436303, at *4 (W.D.

Wis. Dec. 20, 2017) (applying same in discrimination case).  The court of appeals has

directed district courts to "not just ask whether the proposed other-act evidence is relevant

to a non-propensity purpose but [rather] how exactly the evidence is relevant to that purpose

. . . without relying on a propensity inference."  Id.  "Isolated comments must be

contemporaneous with [an adverse action] or causally related to the [adverse action] in order

to be probative of discrimination."  Castetter v. Dolgencorp, LLC, 953 F.3d 994, 997 (7th

Cir. 2020).  Comments made by a non-decisionmaker, even if management, are not relevant

to the question of discriminatory intent.  Stephens, 569 F.3d at 793.

Unlike the statements made about the scope of defendant's TAD policy, some of the

comments about breastfeeding could suggest animus on the part of the speaker.  However,

plaintiff provides no evidence that the comments were either part of or influenced

defendant's decision to deny pregnant women light duty for any pregnancy-related medical

restrictions.  The alleged comments were made by individuals who had no authority with respect to the TAD policy or claimants' requests for accommodations for pregnancy-related medical restrictions.

Moreover, plaintiff has failed to show that accommodations regarding breastfeeding are sufficiently related to accommodations regarding pregnancy-related medical restrictions to be probative of discrimination.  Although plaintiff argues that lactation is a pregnancy-related medical condition for the purposes of the Pregnancy Discrimination Act, it fails to show how requests for light duty during pregnancy and requests for clean, private spaces and breaks to express breast milk are factually similar.  The claimants in this case sought modifications to their job duties, such as the weight of products they were required to lift or amount of time they were required to stand, whereas breastfeeding associates sought the ability to take short breaks from work and a clean and private space in which to express milk. Pregnant employees with medical restrictions and employees who are breastfeeding are subject to separate employment policies and types of accommodation that are administered by different decision makers.  In fact, as defendant points out, the alleged harassment that some claimants experienced while breastfeeding actually may violate defendant's written policies regarding breastfeeding.  Dkt. #191 at ¶ 39.

The cases that plaintiff cites in its brief state only that lactation is protected under the act; they do not support plaintiff's broad contention that "evidence of animus towards breastfeeding is evidence of animus towards pregnancy."  See Hicks v. City of Tuscaloosa, Alabama, 870 F.3d 1253, 1258-59 (11th Cir. 2017); EEOC v. Houston Funding II, Ltd.,

717 F.3d 425, 428-430 (5th Cir. 2013); Gabler v. City of Milwaukee, 2018 WL 2100282, *7 (E.D. Wis. May 7, 2018).  Contrary to plaintiff's suggestion, evidence of defendant's alleged discrimination against breastfeeding associates is too remote to be considered mere "background evidence" of an allegedly discriminatory light duty policy.  National R.R. Co. v. Morgan, 536 U.S. 101, 113 (2002) (allowing prior, related time-barred acts of racial hostility as background evidence to support timely hostile work environment claim).  See also O'Neal v. City of Chicago, 588 F.3d 406, 409 (7th Cir. 2009) (plaintiff's eight time-barred involuntary job transfers considered background evidence for claims involving subsequent, involuntary job transfers); Mendenhall v. Mueller Streamline Co., 419 F.3d 686, 692 (7th Cir. 2005) (error to exclude from evidence of retaliation claim the underlying conduct about which the plaintiff had complained).  Plaintiff is essentially asking the court (and presumably would later ask the jury) to conclude that defendant was more likely to discriminate against pregnant women with medical restrictions because some of defendant's lower-level employees showed animus toward women who were breastfeeding.  Waite, 2017 WL 11436303, at *5 and n.8 (finding same).  This is insufficient and amounts to an improper attempt to show defendant's propensity to discriminate against women who are or had been pregnant.  Id.

For these reasons, defendant is entitled to summary judgment with respect to plaintiff's disparate treatment claim.

ORDER

IT IS ORDERED that

1.  Defendant Wal-Mart Stores East, LP's motion for summary judgment, dkt. #146, is GRANTED.

2.  Plaintiff Equal Employment Opportunity Commission's motion for summary judgment, dkt. #143, and motion to compel a 30(b)(6) deposition, dkt. #200, are DENIED.

3.  The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 19th day of February, 2021.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge